## Schielke's Estate

Before Lamorelle, P. J., and Gest, Van Dusen, Stearne and Sinkler, JJ.

The facts appear from the following extracts from the adjudication of

STEARNE, J., auditing judge.—The decedent died on June 21, 1932, leaving a will dated January 25, 1930, and leaving to survive him a widow, Louisa Schielke, and four children, Henry Schielke, Anna Hamilton, Otto Schielke, and Mary Marie Diegner, all of whom are living and of age.

The widow, by writing dated October 7, 1932, elected to take against the will of the decedent. Said election has been duly recorded and filed. . . .

By the terms of his will the testator directed the payment of his debts; directed that his burial expenses should not exceed $500; devised premises 4503 Comly Street, Philadelphia, to his son Henry Schielke; gave to his daughter Anna Hamilton $1; gave to his son Otto Schielke $1; directed that, if the property located at 4503 Comly Street, Philadelphia, should be clear of encumbrance at the time of his death, then his son Henry should pay a sum up to and including the amount of $500 for his burial expenses, but should the property be encumbered with any mortgages at the time of his death then the above statement to be revoked and the funeral expenses to be paid from the remainder of his estate; gave his residuary estate to his daughter Mary Marie Diegner, and appointed her executrix of the will.

The widow petitioned the court for her exemption of $500 as allowed by section 12 of the Fiduciaries Act of June 7, 1917, P. L. 447. Exceptions were filed thereto and, upon hearing, the matter was left for adjudication upon audit of the account.

Mary Marie Diegner, daughter of the decedent and residuary legatee under the will, resists the claims of the widow because of the terms of an agreement of separation dated August 28, 1908, recorded on March 1, 1927. Counsel for the widow admits the execution of the agreement and the receipt and retention of the enumerated consideration, but claims an abrogation of the covenants of the agreement because of the subsequent reconciliation and cohabitation of the decedent and his wife.

As the question involved is one chiefly of law, I do not deem it necessary to recite the details of the unhappy marital relations which existed between the decedent and his wife, as to which my sympathy is entirely with the widow. I

find that the decedent and his wife were lawfully married; that they separated in August 1908, and executed the agreement of August 28, 1908, referred to above; that the consideration mentioned in the agreement was duly paid and received; that no part of the consideration was ever repaid; that there was a reconciliation and resumption of the marital relations in or about 1908 which continued, with two or three minor interruptions, until 1924; and that after 1924, through no fault of the widow, the marital relations terminated, and the parties continued to live separate and apart until the husband's death in 1932.

The question of law is the legal effect of the subsequent reconciliation upon the agreement. As I read the cases, if the agreement is one of separation only, reconciliation abrogates it insofar as the unexecuted provisions thereof are concerned. Where the agreement, however, is in effect a post-nuptial settlement, such reconciliation does not abrogate the same. I am therefore required to construe this document, aided, if necessary, by surrounding facts and circumstances. The question therefore is: Was the agreement merely an article of separation, or was it a post-nuptial settlement which defined the respective property rights of the parties?

The agreement reads as follows:

"Articles of separation between husband and wife.

"This indenture made the 28th day of August, 1908, between Charles Schielke of the City of Philadelphia, party of the first part, and Louisa Schielke, his wife, party of the second part.

"Whereas divers disputes and unhappy relations have arisen between the said party of the first part and the said party of the second part, for which reason they have consented and agreed to live separate and apart from each other during their natural lives, therefore this indenture witnesseth:

"That the said party of the first part in consideration of the premises and the further sum of $1 unto him well and truly paid and in pursuance thereof doth hereby covenant, promise, and agree to and with the party of the second part that it shall and may be rightful for her as said wife, party of the second part, at all times hereafter to live separate and apart from him; and that he shall and will allow her to reside in such place and places and in such family and families and with such relations, friends, and other persons and to follow and carry on such trade or business or occupation as she may from time to time choose; and he shall and will not at any time compel her to live with him, or molest, disturb, or trouble her for living separate and apart from him, or trouble any other person whomsoever for receiving, entertaining, or harboring her; and that he will not, without her consent visit her or knowingly enter any house or place where she will reside or be; neither shall he or will at any time hereafter claim or demand any of her money, jewels, plate, clothing, household goods, or stock in trade, which she now hath or may procure at any time hereafter or which shall be devised, given or sold to her or which she may otherwise acquire; and that she will and may enjoy absolutely and dispose of the same as if she were feme sole and not married.

"And further that the said party of the first part shall and will well and truly divide and give unto her, his said wife one half of the household furniture which is now owned by him or them and in lieu of support and maintenance shall grant, bargain, sell, and assign unto her, his said wife, all his right, title, and interest of and into four certain indentures of mortgage accordingly aggregating the sum of $3,200; and will also grant all his right, title, and interest of and to a certain lot situate on the southerly corner of Higbee Street and Jackson Street in the forty-first ward of the City of Philadelphia, containing in front on said Higbee Street 50 feet and in depth 112 feet 6 inches.

"And the said party of the second part agrees that she will make no claim for support or allowance, upon the party of the first part doing what is herein specified.

"And the said party of the first part further agrees that he will not at any time hereafter claim any interest by right of curtesy or otherwise in the estate of the said party of the second part, and hereby releases, quitclaims and discharges the estate of the party of the second part of all right of curtesy which might accrue to him;

"And the said party of the first part further agrees that, if at any time it becomes necessary by reason of law to have him join in mortgage, deed, or any other instrument in any way appertaining to the above-described property transferred to the party of the second part, he will upon request sign and execute such deed, mortgage, or other instrument.

"And the said party of the second part hereby releases, quitclaims, and discharges any estate of her said husband from all claim of dower or dower rights whatsoever;

"And the said party of the second part further agrees that, if at any time by reason of law it becomes necessary that she join in any deed, mortgage, or other instrument appertaining to the above-described property owned by her husband, she will upon request sign and execute any such deed, mortgage or other instrument.

"That this agreement is made voluntarily and with the full consent of both parties hereto and is intended to be a full and final agreement determining the separate rights of said parties thereto; and preventing each of said parties from interfering or claiming anything whatsoever in the estate of (personal or real) the other party.

"That this agreement is made with the full understanding and knowledge thereof and after careful consideration of the premises thereof and without compulsion on the part of anyone whatsoever.

"In witness whereof the said parties have hereunto set their hands and seals, the day and year first above written.

Signed, sealed and delivered in the presence of us

| WALTER K. WOOD, | CHARLES SCHIELKE | (Seal) |
| HERBERT U. PORTER, | LOUISA SCHIELKE | (Seal) |

"On the 28th day of August, A. D. 1908, to me the subscribed notary public for the Commonwealth of Pennsylvania residing in the City of Philadelphia personally appeared the above-named Charles Schielke and Louisa Schielke, his wife, and in due form of law acknowledged the foregoing indenture and agreement to be their voluntary and separate act and deed and desire the same might be recorded as such; and the said Louisa Schielke being examined and apart from her said husband do also declare that she signed, sealed, and delivered the above agreement or indenture as her voluntary act and deed free from any compulsion or coercion on the part of her husband.

"Witness my hand and notarial seal the day and year aforesaid.

WALTER K. WOOD,
Notary Public
(Seal)          Commission expires April 23, 1911.

"Recorded in the Office for Recording of Deeds in and for the County of Philadelphia, in Deed Book J. M. H. No. 2530, page 142.

"Witness my hand and seal of office this 1st day of March, A. D. 1927.

JAMES M. HAZLETT,
Recorder of Deeds
By Rorher,
Deputy Recorder."

Apparently the only cases in point in this Commonwealth are Burkholder's Appeal, 105 Pa. 31, Singer's Estate, 233 Pa. 55, Henkel's Estate, 59 Pa. Superior Ct. 633, and Ray's Etate, 304 Pa. 421. I have studied these cases with care, and have examined the paper books and records in the last two cases mentioned. An exhaustive and excellent discussion of the cases in England and the United States may be found in the auditor's report in the appellant's paper book in Ray's Estate, supra, pages 81a et seq.

Before discussing the Pennsylvania cases, which clearly rule as above stated, two collateral questions should be noticed which are apt to cloud the consideration of the main issue. The first is that payment of support in a lump sum does not necessarily constitute the agreement a post-nuptial settlement: Henkel's Estate, supra. Such a contract, like any other agreement, depends upon the bargain of the parties. It is very much like Scott's Estate, 109 Pa. Superior Ct. 515, where an owner agreed to pay a caretaker of real estate a stipulated sum for services until he (the owner) was able to sell the real estate. While in fact the real estate was subsequently sold very quickly, and the compensation to the caretaker was extraordinarily high, nevertheless, as the court pointed out, it might well have operated the other way. Therefore, in separation agreements, whether support is provided for periodically or in a lump sum, a reconciliation abrogates the agreement. In lump payments for support, followed by reconciliation, such payments are regarded in the nature of gifts which the reconciled wife is permitted to retain, while at the same time the other executory terms of the agreement are canceled. See Knapp, Exec., v. Knapp, 95 Mich. 474, 478, and Roberts v. Hardy, Admr., 89 Mo. App. 86, 94.

The second point in this connection is the effect of a covenant waiving dower in a separation agreement, contradistinguished from a post-nuptial settlement, the release of dower is regarded as executory because dower rights do not arise until the death of the spouse. See Henkel's Estate, supra.

Construing the present agreement from its four corners, and considering all the facts and surrounding circumstances, the controlling question is: Was this agreement executed to depend and apply only to a state of separation between the parties, or was it intended as a settlement independent of the separation? Upon the answer depend the rights of the present widow.

The Burkholder and Singer cases, supra, are clear cases of post-nuptial settlements, held to be enforceable irrespective of subsequent reconciliation. The facts of these cases being so different, the decisions are of little assistance in the present inquiry. The Henkel case, supra, is decidedly in point as to a pure separation agreement, whereas the principle enunciated in the Ray case, supra, rules post-nuptial contracts. Certain of the facts of the instant case parallel both the Henkel and the Ray facts. It is my problem to decide which case applies.

I have read the agreement in the Henkel case, found on page 25a of appellant's brief, 59 Pa. Superior Ct. 633. It would indeed appear that the same form book had been used as the basis for both agreement structures. Both recite the "divers disputes and unhappy differences" of the parties and their agreement to live separate and apart, etc., and the waiver of the rights of each in the estate of the other. The Henkel agreement admits receipt of $2,350 from the husband by the wife "for . . . [her] decent support and maintenance". The instant case provides for the transfer of one half of the furniture and "in lieu of support and maintenance" the husband agrees to assign the mortgages and convey the real estate (which he did). Up to this point, the facts in both cases are substantially the same.

It is to be observed, however, that in the Henkel case the agreement is wholly silent as to the intent of the parties to fix and definitely determine the property rights of the respective parties. In the case now before me a clause is found next to the last paragraph in the agreement which reads as follows:

"That this agreement is made voluntarily and with the full consent of both parties hereto and is intended to be a full and final agreement determining the separate rights of said parties hereto; and preventing each of said parties from interfering or claiming anything whatsoever in the estate of (personal or real) the other party."

It is my opinion, and I so rule, that the language of this clause comprehends and includes "property rights", as well as all other enumerated rights and privileges mentioned in said agreement.

In the Henkel case, Judge Over ruled (affirmed per curiam by the Superior Court) that the agreement was one of separation only and was abrogated so far as its unexecuted provisions were concerned by the subsequent reconciliation.

In the Ray case, the agreement may be found on page 78a of appellant's paper book, 304 Pa. 421. It is entitled "Separation Agreement", and recites that the parties had been legally married and cohabited; the existence of differences, the determination to no longer continue the marriage relation; that they were presently living separate and apart; and that

"It is the desire of both parties to finally and for all time settle and determine their property rights, or rights of support and maintenance of . . . [the wife] by the . . . [husband], all dower rights or rights in lieu thereof, together with any and all other existing rights between the said parties, growing out of the marriage relation."

By the agreement, the husband created a substantial trust for the benefit of the wife and her child. The agreement waived all dower rights. The agreement was fully executed. Thereafter there was a reconciliation and, upon the death of the husband, the widow elected to take against the will and claimed dower rights. The Supreme Court ruled that the agreement constituted a post-nuptial settlement of the property rights between the husband and his wife, which was not affected by the subsequent reconciliation.

The only other case which I have been able to discover in this jurisdiction is Fleming's Estate, Orphans' Court of Philadelphia County, October term, 1927, no. 3090 (not reported). It was an adjudication by MacHenry Wilhelm, P. J., specially presiding. The agreement of separation fixed no property rights, and apparently there was no payment of an agreed consideration. It was ruled that a reconciliation abrogated the agreement.

After mature deliberation, I have reached the conclusion that the recital in the present agreement to the effect that it was intended to be a "full and final agreement determining the separate rights" of the parties is quite as definite and conclusive as the words of the agreement in the Ray case where it was "the desire of both parties to finally and for all time settle and determine their property rights." I can discover no fundamental difference in the expression of intent between the two cases.

I note in the present case that most of the disagreements between the parties arose over property rights. After the reconciliation, the husband endeavored to induce his wife to return to him the property—real and personal—which he had transferred to her. This the wife declined to do, and she still retains the same. Of course, under the foregoing authorities, this may or may not be evidence of the intent of the parties as to the nature of the agreement; nevertheless it is to be observed that whatever its nature the wife intended to, and did in fact, retain the agreed consideration. It would have been quite a simple

matter to have canceled and destroyed the agreement at any time prior to 1924 if the reconciliation was intended to obliterate all covenants in the agreement. It is also to be observed that the document was not recorded until 1927—3 years after final separation of the parties. There are no surrounding facts or circumstances which, to my mind, alter or vary the plain terms of the contract itself.

What has been said above applies equally to the widow's right to elect as to her exemption of $500. The claim for exemption is based on the provisions of section 12 of the Fiduciaries Act of 1917, which provides that the widow is entitled to the exemption if she has not "forfeited her rights". One of the essential features necessary to an allowance of the exemption is the existence of a family relation between the widow and the decedent at the time of his death, except where its severance was the fault of the husband. See Crawford's Estate, 1 D. & C. 729. I find that, for reasons stated above, the widow did forfeit her rights, that there was no family relation existing at the time of the death of the decedent, and that the nonexistence of such family relations was not due to the sole fault of the husband, but that the separation was consentable and mutual.

In fairness, I cannot help but express my regret at this widow's situation. Her husband was far from what he should have been. She did nothing, in my opinion, which justified the inexcusable conduct on the part of the husband. Over 25 years ago she elected to define, protect, and insure her own property rights, and, by the execution of the agreement and the acceptance and retention of the consideration specified therein, she now, in my opinion, is precluded from sharing in his estate.

I therefore rule, under authority of Ray's Estate, supra, that Louisa Schielke, the widow, because of her execution of the post-nuptial agreement dated August 28, 1908, is barred from electing to take against the decedent's will and receiving her widow's share under the intestate law, as well as her exemption of $500. . . .

David R. Griffith, Jr., for exceptant; C. Bentley Collins, contra.

SINKLER, J., March 2, 1934.—The facts are fully set forth in the adjudication. The auditing judge has correctly applied the relevant principles of law in reaching his conclusion, to wit, that the agreement between the husband and wife was in terms a final settlement of their mutual property rights, and that, having been executed through the transfer of substantial property, both real and personal, from him to her, it is conclusive against her right of election to take against his will and, as well, her right to claim the widow's exemption. We emphasize the effect of her refusal of his request, made after the reconciliation, that she return to him the property he had made over to her pursuant to the terms of the agreement. One witness describes this request as evidence of the husband's desire to put all the property in one lot—to have but one pocketbook for both. Had she complied with his request she might well assert the abrogation of the agreement and claim her full rights, as surviving spouse, in his estate.

The exceptions are dismissed and the adjudication is confirmed absolutely.